IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

MARTIN MARIETTA MATERIALS,
INC., and HUNT MARTIN
MATERIALS, LLC,

                    Plaintiffs,

          vs.                                    Case No. 12-2699-SAC

KANSAS DEPARTMENT OF
TRANSPORTATION, and MIKE
KING, in his individual and official
Capacity as Kansas Secretary of
Transportation, and JERRY YOUNGER,
in his individual and official capacity
as Deputy Secretary of Transportation
State Transportation Engineer,

                    Defendants.

MEMORANDUM AND ORDER

          The case comes before the court on the defendants' motion for

judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (Dk. 22), and

on the plaintiffs' motion for leave to file first amended complaint pursuant to

Fed. R. Civ. P. 15(a)(2). (Dk. 31).  Asserting diversity and subject matter

jurisdiction, the plaintiffs, collectively referred to as "Martin Marietta," are

suing due to the removal of their two Kansas limestone quarries from the

Kansas Department of Transportation's ("KDOT") approved or pre-qualified

list of concrete aggregate suppliers. Martin Marietta's complaint includes 12

counts alleging violations of federal constitutional rights, state regulations

and state tort law entitling them to monetary, declaratory and injunctive relief. The defendants have filed their answer. (Dk. 6).

After the defendants filed their Fed. R. Civ. P. 12(c) motion, the plaintiffs sought leave to file an amended complaint. (Dk. 31). The plaintiffs explain in their motion that the requested amendments include the defendants' wrongful removal of another Martin Marietta quarry from KDOT's approved listings, incorporate recently acquired information on more wrongful acts by the defendants, and offer additional facts to support the claims challenged in the defendants' motion. The plaintiffs do not state that their proposed amendments concede any legal challenges that have been raised in the defendants' Rule 12(c) motion. In their last filing, the reply in support of their motion to amend, the plaintiffs state they "will dismiss without prejudice" their "claims under K.A.R. § 36-31-2 (Count One), the Takings Clause (Count Ten), and . . . for negligent interference with contractual relationships (Count Five), and would have no objection to the Court dismissing these claims without prejudice."  (Dk. 47, p. 3 n. 1). While a motion for leave to amend is typically regarded as a nondispositive matter routinely handled by the magistrate judge, the district judge will handle both motions at the same time due to the overlapping issues. Thus, for the sake of convenience and simplicity, the court will collapse its analysis of the defendants' Rule 12(c) motion and the defendants' legal arguments on futility in opposing leave to amend.

**STANDARDS ON MOTIONS**

After a responsive pleading has been served, "a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The Rule directs that a "court should freely give leave when justice so requires." *Id*. "The purpose of the Rule is to provide litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" *Minter v. Prime Equipment Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006) (quoting *Hardin v. Manitowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir.1982)). A plaintiff is entitled to test the merits of a claim assuming "the underlying facts or circumstances relied upon . . . may be a proper subject of relief." *Foman v. Davis*, 371 U.S. 178, 182 (1962). Proper grounds for denying leave include "'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.'" *Minter*, 451 F.3d at 1204 (quoting *Foman*, 371 U.S. at 182).

"A court properly may deny a motion for leave to amend as futile when the proposed amended complaint would be subject to dismissal for any reason, including that the amendment would not survive a motion for summary judgment." *Bauchman for Bauchman v. West High School*, 132 F.3d 542, 562 (10th Cir. 1997), *cert. denied*, 524 U.S. 953 (1998). Simply

stated, "a proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Bradley v. Val-Mejias*, 379 F.3d 892, 901 (10th Cir. 2004) (internal quotation marks and citation omitted). "The futility question is functionally equivalent to the question whether a complaint may be dismissed for failure to state a claim." *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999) (citations omitted). "The burden of showing futility rests with the defendants who assert this ground in opposing the plaintiff's leave to amend." *Meyer v. City of Russell*, 2012 WL 5878613, at *2 (D. Kan. 2012) (citing *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 231–32 (E.D. Pa. 2012); *Boykin v. CFS Enterprise, Inc.*, 2008 WL 4534400 at *3 (D. Kan. 2008)). Thus, a court may deny leave to amend if the proposed amendments fail to state plausible claims under Rule 12(b)(6).

"A motion for judgment on the pleadings under Rule 12(c) is treated as a motion to dismiss under Rule 12(b)(6)," *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir.2000), and the same standards apply to both motions, *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). The court will apply the same standards for evaluating both motions. If the allegations in the petition lack plausibility, defendants are entitled to judgment on the pleadings, and if the allegations in the proposed amended complaint lack plausibility, then leave to amend should be denied as futile.

In determining whether to grant or deny the Rule 12(c) motion, or in determining whether amendment would be futile, the court looks to the same following standards. The court accepts as true "all well-pleaded factual allegations in a complaint and view[s] these allegations in the light most favorable to the plaintiff." *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), *cert. denied*, 558 U.S. 1090 (2010). This duty to accept a complaint's allegations as true is tempered by the principle that "mere labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). As recently clarified by the Supreme Court, the standard under Rule 12(b)(6) is that to withstand a motion to dismiss, "a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Al–Owhali v. Holder*, 687 F.3d 1236, 1239 (10th Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)[1]). Thus, "a plaintiff must offer sufficient factual allegations to 'raise a right to relief above the speculative level.'" *Kansas Penn Gaming*, 656 F.3d at 1214 (quoting *Twombly*, 550 U.S. at 555). "The plausibility standard is not akin to

---

[1] *Iqbal* requires two prongs of analysis. First, the court separates out "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusion, bare assertions, or merely conclusory. 556 U.S. at 680–81. Second, the court evaluates the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681

a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). It follows then that if the "complaint pleads facts that are 'merely consistent with' a defendant's liability it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* "'A claim has facial plausibility when the [pleaded] factual content . . . allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1178 (10th Cir.2012). "Thus, in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider whether the remaining specific factual allegations, if assumed to be true, plausibly suggest the defendant is liable." *Kansas Penn Gaming*, 656 F.3d at 1214. The Tenth Circuit regards the *Twombly–Iqbal* decisions as crafting a new "refined standard" whereby "plausibility refers to 'the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs "have not nudged their claims across the line from conceivable to plausible."'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting in turn *Twombly*, 550 U.S. at 570).

On a motion to dismiss or for judgment on the pleadings, courts apply the general rule of considering only the contents of the complaint. *Gee*

*v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir.2010). Exceptions include the following: documents incorporated by reference in the complaint; documents referred to in and central to the complaint, when no party disputes its authenticity; and "'matters of which a court may take judicial notice.'" *Id.* (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007)). In this circuit, the exception has been explained that:

> if a plaintiff does not incorporate by reference or attach a document to its complaint, but the document is referred to in the complaint and is central to the plaintiff's claim, a defendant may submit an indisputably authentic copy to the court to be considered on a motion to dismiss.

*GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

**COMPLAINT**

Martin Marietta has provided aggregate, crushed limestone and granite, from its quarries to make concrete pavement on KDOT projects. All aggregate used on KDOT projects must be supplied from a quarry appearing on KDOT's maintained list of pre-approved quarries. KDOT sets the standards required for a quarry to appear on the pre-approved list.

Martin Marietta's quarry located near Ottawa, Kansas, ("Ottawa Quarry") had appeared on KDOT's approved list ("A-Listing") for a couple decades. KDOT recently adopted a policy of removing quarries based on observed and confirmed D-Cracking on three stretches of road less than 20-years old in which aggregate from the same quarry was used. KDOT defines D-Cracking as the process whereby limestone paving cracks from expanding

and contracting during freeze-thaw cycles. KDOT applies this new policy as a rule or regulation on performance specification for quarries.

By letter in October of 2010, KDOT informed Martin Marietta that the Ottawa Quarry was removed from the A-listing. It is alleged that then Secretary of Transportation Debra Miller and Deputy Secretary of Transportation Jerry Younger "authorized the removal" and did not give prior notice of any intent to remove. (Dk. 1, ¶¶ 13-14). Martin Marietta made numerous requests for a hearing to challenge this removal, and these requests were denied. Current Secretary of Transportation Mike King has continued to deny these requests.

Martin Marietta challenges KDOT's findings and conclusion of D-Cracking and allege that independent testing reveals KDOT wrongly attributed the cracking to the limestone aggregate. Martin Marietta asserts that if a hearing had been held before or after the removal of the Ottawa quarry, then it would have proved the defendants were wrong in believing the observed D-Cracking was due to the limestone coming from Ottawa quarry. Martin Marietta also alleges the Ottawa Quarry's removal from the A-Listing is a continuing representation to the public that has resulted in the loss of business.

Since the 2010 removal, the defendants are alleged to have selected arbitrarily some quarries for the prequalified list and have refused or delayed to test other quarries, including the plaintiffs'. Martin Marietta

alleges the defendants have agreed to test some but not all of its quarries for the A-Listing. Martin Marietta further alleges when the defendants have tested the plaintiffs' quarries a compliance standard was used on its quarries that was different from what was used on other quarries. Additionally, Martin Marietta sought to have a granite quarry in Oklahoma approved for aggregate, "but KDOT refused, despite the fact that it had no evidence that Martin Marietta's granite does not meet all applicable KDOT specifications." (Dk. 1, ¶ 33). It is alleged that KDOT pre-qualified two other out-of-state quarries and only denied Martin Marietta's Oklahoma quarry.

On these facts, the plaintiffs fashion the following counts for relief: "Count I: Violation of K.A.R. § 36-31-2," as the defendants did not comply with the debarment procedures required in this regulation, (Dk. 1, p. 10); "Count II: Violation of Procedural Due Process" guaranteed in federal and state constitutions by not providing a pre-deprivation hearing before depriving Martin Marietta of its asserted property interest and liberty interest "in being on the A-Listing and in supplying limestone from its Ottawa quarry from A-Listing," (Dk. 1, p. 11-12); "Count III: Violation of Procedural Due Process" guaranteed in federal and state constitutions by not providing a post-deprivation hearing after depriving Martin Marietta of its asserted property and liberty interests, (Dk. 1, p. 13); "Count IV: Intentional Interference with Business Relationships" in the loss of contracts and business caused by the defendants' removal of the Ottawa quarry from the

A-Listing and refusal to return it to the A-Listing, (Dk. 1, p. 15); "Count V: Negligent Interference with Business Relationships" in the loss of contracts and business caused by the defendants' removal of the Ottawa quarry from the A-Listing and refusal to return it to the A-Listing, (Dk. 1, p. 17); "Count VI: Defamation" for falsely representing that Ottawa Quarry did not satisfy the requirements for the A-Listing, (Dk. 1, p. 18); "Count VII: Violation of Equal Protection" clause in federal and state constitutions for the defendants' testing of quarries and decisions to prequalify some quarries but not the plaintiffs' quarries, (Dk. 1, p. 19); "Count VIII: Violation of Substantive Due Process" in federal and state constitutions for the defendants' arbitrary and irrational actions that denied the plaintiffs of their liberty and property interests, (Dk. 1, p. 21); "Count IX: Violation of the Takings Clause" by the deprival of plaintiffs' property right to be on A-Listing, (Dk. 1, p. 22); "Count X: Request for Preliminary and Injunctive Relief" that would put the Ottawa Quarry on A-Listing until the hearings were held and would require the prequalification and testing of all Martin Marietta quarries, (Dk. 1, p. 23); and "Count XI: Request for Declaratory Relief," (Dk. 1, p. 24).

**FIRST AMENDED COMPLAINT**

The plaintiffs seek to add the following factual allegations. In January of 2013, the defendants changed the name of the A-Listing to the Prequalified List ("PQL"). Martin Marietta alleges that the Federal Highway Administration ("FHWA") did petrographic analysis of the concrete cores and

determined that the initial cracking was not due to D-cracking. KDOT then allegedly hired the testing laboratory, CTL, to perform multiple petrographic examinations, and CTL also concluded the cracking mechanism was not D-cracking. KDOT documents allegedly reveal that KDOT had not done its own petrographic examinations to confirm D-cracking before removing the Ottawa quarry from the A-Listing. The plaintiffs allege the FHWA and CTL test results were concealed from Martin Marietta.

Martin Marietta alleges that the defendants acted arbitrarily and capriciously in adopting sometime on or before January 2013 a new "rule, regulation, standard specification, or policy of requiring concrete aggregate to pass a 660 cycle freeze-thaw test with a 95% durability factor to be on the PQL." (Dk. 31-1, ¶ 32). Without notice or hearing, KDOT removed Martin Marietta's Sunflower Quarry from the PQL for allegedly failing this new policy.

Martin Marietta proposes adding a count of void for vagueness, Count IX, as an alternative claim for relief to counts one through three, seven and eight. The allegations are that if the defendants have, as they claim, the unfettered discretion to remove quarries from the A-Listing/PQL, then the defendants' asserted power is unconstitutional and void for vagueness.

**ELEVENTH AMENDMENT**

The Eleventh Amendment states: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." This Amendment creates an immunity that "accord[s] states the respect owed them as joint sovereigns," "applies to any action brought against a state in federal court, including suits initiated by a state's own citizens," and "applies regardless of whether a plaintiff seeks declaratory or injunctive relief, or money damages." *Steadfast Ins. Co. v. Agricultural Ins. Co.*, 507 F.3d 1250, 1252 (10th Cir. 2007). "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. Of Trustees of Univ. of Ala. V. Garrett*, 531 U.S. 356, 363 (2001). "'The Eleventh Amendment is a jurisdictional bar that precludes unconsented suits in federal court against a state and arms of the state.'" *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting *Wagoner County Rural Water Dist. No. 2. v. Grand River Dam Authority*, 577 F.3d 1255, 1258 (10th Cir. 2009)).

Eleventh Amendment immunity extends to state entities that are deemed to be "arm[s] of the state." *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-30 (1997); *Steadfast Ins. Co.*, 507 F.3d at 1253. As a state agency, KDOT is afforded Eleventh Amendment immunity. *See Gorsline v. State, Dept. of Transp.*, 1993 WL 455254 (D. Kan. 1993), *aff'd*,

21 F.3d 1121, 1994 WL 118174 (10th Cir. 1994); *cf. Logistics Exp. Inc. v. Kansas State Dept. of Transp.*, 1991 WL 287212 (D. Kan. 1991) ("KDOT is an arm or alter ego of the State of Kansas."). As applied against a state, Eleventh Amendment immunity is subject to two exceptions:  "(1) Congress may abrogate a State's Eleventh Amendment immunity in the exercise of its power to enforce the Fourteenth Amendment and (2) a State may waive its Eleventh Amendment immunity by consenting to suit." *Harris v. Oklahoma Office of Juvenile Affairs ex rel. Cent. Oklahoma*, 2013 WL 828859 at *1 (10th Cir. 2013) (citing *Coll. Sav. Bank v. Fla. PrePaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 670 (1999)). The exception established in *Ex Parte Young*, 209 U.S. 123 (1908), for official capacity actions against state officers seeking only prospective relief, "'has no application in suits against the States and their agencies, which are barred regardless of the relief sought.'" *Higganbotham v. Oklahoma ex rel. Oklahoma Transp. Com'n*, 328 F.3d 638, 644 (10th Cir. 2003) (quoting *Puerto Rico Aqueduct v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993)). The plaintiffs concede the State of Kansas has invoked and preserved its Eleventh Amendment immunity. (Dk. 36, p. 27). Thus, KDOT is entitled to dismissal,[2] and the plaintiffs' motion for leave to amend is denied as futile insofar as it continues to name KDOT as a party defendant.

---

[2] With the dismissal of KDOT, the defendants' argument for dismissing the official capacity actions as duplicative is groundless.

In their combined memorandum that serves as a reply to their Rule 12(c) motion and as a response to the plaintiffs' motion to amend, the defendants raise additional Eleventh Amendment arguments in response to the plaintiffs' latest filings. Suits against state officials in their official capacity are regarded as suits against the official's office and, thus, are treated as if suits against the state and subject to Eleventh Amendment immunity. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985); *see Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989). The exception argued here is as follows:

> In *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), the Supreme Court carved out an exception to Eleventh Amendment immunity for suits against state officials seeking to enjoin alleged ongoing violations of federal law. *See id.* at 159–60, 28 S.Ct. 441; *Hill v. Kemp*, 478 F.3d 1236, 1255–59 (10th Cir. 2007) (discussing rationale and subsequent history of *Ex parte Young*). The *Ex parte Young* exception proceeds on the fiction that an action against a state official seeking only prospective injunctive relief is not an action against the state and, as a result, is not subject to the doctrine of sovereign immunity. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 105, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (noting "fiction of *Young*"); *Hill*, 478 F.3d at 1256 (same). By adhering to this fiction, the *Ex parte Young* doctrine enables "federal courts to vindicate federal rights and hold state officials responsible to the supreme authority of the United States." *Pennhurst*, 465 U.S. at 105, 104 S.Ct. 900; see also *Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 495 (10th Cir. 1998) (internal quotation marks omitted).

*Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011). The *Young* exception only applies to allegations of "ongoing violation[s] of federal law." *Id.* at 1155 (quoting *Verizon Maryland, Inc. v. Public Service Com'n of Maryland* , 535 U.S. 635, 645 (2002)). Thus, "federal courts have

no jurisdiction to entertain a suit that seeks to require the state official to comply with state law." *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1188 (10th Cir. 1998) (citing and quoting *Pennhurst*, 465 U.S. at 106, for, "'[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. . . . We conclude that *Young* and *Edelman* are inapplicable in a suit against state officials on the basis of state law.'")), *cert. denied*, 525 U.S. 1122 (1999). The plaintiffs may not resort to the *Young* exception in bringing any state law or state constitutional claim against the individual defendants in their official capacity. The individual defendants in their official capacities are entitled to dismissal on all such state claims, and the plaintiffs' motion for leave to amend is denied as futile insofar as pleading any state law or state constitutional claims and seeking relief for the same against the individual defendants in their official capacities.

In challenging the plaintiffs' use of the *Ex Parte Young* exception, the defendants also contend that the plaintiffs' pleadings fail to allege federal law violations. The Tenth Circuit characterizes this inquiry as whether the "the plaintiffs have alleged a non-frivolous violation of federal law." *Lewis v. N.M. Dept. of Health*, 261 F.3d 970, 975 (10th Cir. 2001) (citation omitted). The court reserves its discussion here for later when it addresses all of the defendants' substantive challenges to the plaintiffs' federal claims of relief.

Next, the defendants summarily contend that the plaintiffs'

claimed relief is not prospective in character as they seek declaratory relief about past conduct and they seek injunctive relief to redress something that has already happened. "To determine whether the *Ex Parte Young* doctrine applies, 'a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Guttman v. Khalsa*, 669 F.3d 1101, 1126-27 (10th Cir. 2012) (quoting *Verizon Maryland, Inc. v. Public Service Com'n of Maryland* , 535 U.S. at 645). "A prayer for injunctive relief asking 'that state officials be restrained from enforcing an order in contravention of controlling federal law' satisfies *Verizon's* straightforward inquiry." *Crowe & Dunlevy*, 640 F.3d at 1155. So long as the count alleges an ongoing federal law violation and seeks to enjoin the violation and/or to have it declared unlawful, the pleaded relief is prospective and meets the straightforward inquiry. *See e.g., Muscogee (Creek) Nation v. Oklahoma Tax Com'n*, 611 F.3d 1222, 1232-33 (10th Cir. 2010); *Tarrant Regional Water Dist. v. Sevenoaks*, 545 F.3d 906, 912-13 (10th Cir. 2008); *cf. Virginia Office for Protection and Advocacy v. Stewart*, ---U.S.---, 131 S. Ct. 1632, 1639 (2011) ("There is no doubt VOPA's suit satisfies the straightforward inquiry. It alleges that respondents' refusal to produce the requested medical records violates federal law; and it seeks an injunction requiring the production of the records, which would prospectively abate the alleged violation."); *Chester Bross Const. Co. v. Schneider*, 886 F. Supp. 2d 896, 905 (C.D. Ill.

2012) ("An allegation that a state official enforces a law in contravention of controlling federal law is sufficient to allege an ongoing violation of federal law for the purposes of *Ex parte Young*." (citation omitted)).

Looking principally at the proposed first amended complaint, in their procedural due process counts, two and three, the plaintiffs seek declaratory relief against King and Younger in their official capacities that the plaintiffs are entitled to notice and a hearing before removal from the A-Listing/PQL and injunctive relief against them to provide the plaintiffs with notice and hearing and to restore the quarries to the A-Listing/PQL until the hearings are held. Count seven (equal protection) seeks injunctive relief against the individual defendants in their official capacities by enjoining enforcement of the new testing regimes, by requiring the prequalification of the plaintiffs' quarries, or by ordering the testing of the plaintiffs' quarries within a reasonable period of time. Count eight (substantive due process) seeks injunctive relief against defendants in their official capacities by enjoining enforcement of the new testing regimes and by restoring the plaintiffs' quarries to the A-Listing/PQL. Count nine (void for vagueness) seeks to enjoin the defendants in their official capacities from removing the plaintiffs' quarries for any reason that is not based on KDOT's rules or regulations. On the face of these allegations, the plaintiffs have put forward claims of ongoing federal violations for which they seek prospective relief. At

this juncture, it would appear that these claims do fall within the *Ex Parte Young* exception and are not barred by the Eleventh Amendment.

Finally, the defendants argue the plaintiffs are throwing out the "individual capacity" label just to avoid Eleventh Amendment immunity for monetary relief. The defendants say their activities from which the plaintiffs claim injury and seek relief were simply a function of the defendants' official positions at KDOT. The defendants posit that "[o]nly KDOT is charged with overseeing the construction of roads in Kansas and it is KDOT—not one or more individuals—that establishes the standards and policies that ensure that roads are of the property (sic) quality and durability." (Dk. 40, p. 20). Contending the plaintiffs' claims are really official capacity actions for monetary damages, the defendants believe the Eleventh Amendment should bar the plaintiff's claims for monetary damages.

Because the plaintiffs sue for monetary damages against the individual defendants in their individual capacities, they seek damages only from the individuals and not the state. It is clear that Eleventh Amendment immunity does not protect the individual defendants from such suits:

> Eleventh Amendment immunity is available when suits seeking damages are brought directly against a state. *See Buchwald v. Univ. of N.M. Sch. of Med.*, 159 F.3d 487, 494 n. 3 (10th Cir. 1998); *Johns v. Stewart*, 57 F.3d 1544, 1552 (10th Cir. 1995). As a general rule, suits seeking damages from state officials in their individual capacities are not barred by the Eleventh Amendment. *See Hafer*, 502 U.S. at 30-31, 112 S.Ct. 358; *Papasan v. Allain*, 478 U.S. 265, 277 n. 11, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). "[A] suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer

himself, so long as the relief is sought not from the state treasury but from the officer personally." *Alden v. Maine*, 527 U.S. 706, 757, 119 S.Ct. 2240, 144 L.Ed.2d 636 (1999). The Eleventh Amendment is not implicated in such suits because any award of damages will be satisfied from the individual's personal assets and will not be paid from the state treasury. If the sovereign is obligated to pay any damage award entered against the state official, however, the Eleventh Amendment bars the suit. *See Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).

*Cornforth v. University of Oklahoma Bd. of Regents*, 263 F.3d 1129, 1132-33 (10th Cir. 2001), *cert. denied*, 534 U.S. 1162 (2002). None of the defendants' arguments finds any traction in Tenth Circuit precedent. The defendants cite and discuss case law that relied on other kinds of immunity having no application here.[3] The defendants misplace their reliance on the rule of municipal liability under § 1983 as discussed in *Myers v. Oklahma County Bd. Of County Com'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998), and on an Eleventh Amendment immunity ruling where the plaintiff prisoner brought a claim for indemnity against the Kansas Department of Corrections seeking to hold it liable for the plaintiff's default judgment obtained against its correctional officer, *Jones v. Courtney*, 466 Fed. Appx. 696 (10th Cir. 2012). The defendants have not fashioned any viable Eleventh Amendment argument for barring the monetary damage claims brought against them in their individual capacities.

**PERSONAL PARTICIPATION OF DEFENDANTS**

---

[3] At page 19, the defendants give an incomplete citation to a *Martin* case that relied on immunity created under the Local Government Antitrust Act, and a citation to *Turpin v. Koropchak*, 567 F.3d 880 (7th Cir. 2009), that relied on an Illinois sovereign immunity statute.

To their Eleventh Amendment arguments, the defendants append two paragraphs challenging the plaintiffs' failure to allege their personal participation in some claims for relief. King did not become Secretary of Transportation until over a year after the Ottawa quarry was removed from the A-Listing. Both defendants argue the plaintiffs have failed to allege their personal roles in the exclusion of the Mill Creek Quarry from prequalification. The defendants seek dismissal on these claims.

"[F]or liability to arise under § 1983, a defendant's direct personal responsibility for the claimed deprivation of a constitutional right must be established." *Trujillo v. Williams*, 465 F.3d 1210, 1227 (10th Cir. 2006). Paragraph 55 of the proposed First Amended Complaint alleges only Younger removed the Ottawa Quarry from the A-Listing. (Dk. 31-1, p. 14). As the plaintiffs also allege, King has refused to restore the Ottawa quarry to the A-Listing or to grant them a due process hearing. Thus, the plaintiffs have alleged King's personal involvement in the ongoing constitutional violation concerning the Ottawa quarry.  With regard to the Mill Creek quarry, the plaintiffs allege in their First Amended Complaint that King and Younger "refused to prequalify Martin Marietta's Mill Creek quarry until after this suit was filed." (Dk. 31-1, ¶ 102); *see* ¶ 111. The complaint plainly alleges that King and Younger are personally responsible for refusing to prequalify the Mill Creek quarry. The complaint is sufficient and not subject to dismissal on this ground.

## COUNT ONE:  VIOLATION OF K.A.R. § 36-31-2

The defendants deny that this regulation or its enabling statute, K.S.A. 68-404(1), supports the availability of any private right of action. The defendants correctly argue there is nothing to demonstrate that the legislature intended to create such a right. Additionally, the defendants explain that none of KDOT's actions challenged here meet the regulatory definition of "debarment," that is, "an exclusion or bar from contracting with or bidding on contracts let by the secretary for a specified period of time." K.A.R. § 36-31-1(f).  The plaintiffs argue that the detailed debarment proceedings "suggest a desire to insure that persons who are debarred get their day in court, which is consistent with a private right of action." (Dk. 36, p. 25). It is noteworthy that instead of replying to the defendants' additional arguments regarding K.A.R. § 36-31-2, the plaintiffs concede the dismissal without prejudice of this count should the court grant leave to amend.

The court dismisses this count without prejudice at the plaintiffs' invitation. If this issue had been fully discussed and analyzed, the court would have likely concluded that Kansas case law does not support a private right of action under this regulation. The parties offer nothing from legislative history to suggest that a private right of action was intended. *Pullen v. West*, 278 Kan. 183, 194, 92 P.3d 584 (2004). The parties cite to no relevant implementing statutes that reveal any legislative intent to create a private right of action or to have KDOT create one. *Id*. at 195. Even

presuming the debarment procedures are relevant to this analysis, one would likely consider the scheme to be a comprehensive effort to have these matters addressed administratively by KDOT and subject to any appropriate judicial review. Count one is dismissed without prejudice.

**COUNTS TWO AND THREE—PROCEDURAL DUE PROCESS**

The plaintiffs propose pleading in their First Amended Complaint that they have "a liberty and property interest in being on the A-Listing/PQL and in supplying limestone from its Ottawa and Sunflower Quarries to KDOT projects, provided it meets all validly adopted requirements to be on the A-Listing/PQL." (Dk. 31-1, ¶ 52). They allege their due process rights were violated when the two quarries were removed from the A-Listing/PQL without providing prior notice and a hearing and without granting their subsequent requests for a hearing.

The Fourteenth Amendment forbids a State from depriving "any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To bring a procedural due process claim, the plaintiff "must have a liberty or property interest in the outcome of the proceedings," *Aguilar-Aguilar v. Napolitano*, 700 F.3d 1238, 1244 (10th Cir. 2012) (internal quotation marks and citation omitted), or must have had a liberty or property interest "that was injured or revoked without proper procedural protections," *Schanzenbach v. Town of La Barge*, 706 F.3d 1277, 1283-84 (10th Cir. 2013) (citation omitted).

<u>Property Interest</u>

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). Instead, he must "have a legitimate claim of entitlement to it." *Id*. Protected entitlements do not arise from the Constitution but "are created and their dimension are defined by existing rules or understandings that stem from an independent source such as state law." *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 756 (2005) (internal quotation marks and citation omitted). "[A] benefit is not a protected entitlement if government officials may grant or deny it in their discretion." *Id*. The determination of whether a property interest exists has "state-law underpinnings, [but] is ultimately one of federal constitutional law." *Id*. The Supreme Court has explained:

> Although the underlying substantive interest is created by an independent source such as state law, federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause. . . . Resolution of the federal issue begins, however, with a determination of what it is that state law provides.

*Id.* "Whether a protected property interest exists is a legal question that the Court may decide on a Motion to Dismiss." *Maple Ave. Repair Service, LLC v. Town of North Haven*, --- F. Supp. 2d ---, 2013 WL 593783 at *3 (D. Conn. 2013) (internal quotation marks and citation omitted); *see Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2nd Cir. 1999) ("In almost all cases, the

existence of a federally protectable property right is an issue of law for the court," unless the existence of this right or interest turns on disputed factual issues.); *Continental Coal, Inc. v. Cunningham*, 511 F. Supp. 2d 1065, 1079 (D. Kan. 2007) (the existence of a "protectable interest is a question of law for the Court."). The plaintiffs contend they have alleged sufficient facts to state a claim that is plausible on its face and that raises a right to relief which is above speculative. The plaintiffs believe their allegations are enough to show that with discovery they can prove the existence of protected constitutional interests.

The plaintiffs allege that "KDOT has adopted standards and specifications for construction aggregate it will accept for inclusion on it's A-listing/PQL" and that these "specifications are objective and address the requirements" for materials acceptable on KDOT projects. (Dk. 31-1, ¶ 51). The plaintiffs also allege that the defendants "apply these standards and specifications as a rule or regulation" and that neither these provisions nor any other Kansas law permits the defendants to keep off a quarry or to remove a quarry from "the A-Listing/PQL if it meets the objective standards and specifications."  (Dk. 31-1, ¶ 51). While not alleged in the proposed amended complaint, the plaintiffs point to the statutory power given the Secretary of KDOT to "devise and adopt standard plans and specifications for road . . . construction," K.S.A. 68-404(c), and "to adopt rules and regulations to carry out the provisions of this act," K.S.A. 68-404(k).

The plaintiffs assert the defendants have exercised this authority in adopting the "Standard Specifications for State Road and Bridge Construction (2007)" and supplemented them with "Special Provision to the Standard Specifications, 2007 Edition." (Dk. 36, p. 11). The plaintiffs quote from these specifications the following: "The Engineer will accept aggregates for on-grade concrete based on the prequalification required by this specification, and by the requirements of subsection 1101.5" *Id.* at 11-12. The plaintiffs read none of the specifications as giving the defendants the discretion to bar or remove a quarry from the prequalified list if it satisfies the fixed and readily ascertainable specifications. The plaintiffs refer to § 1101.4 that provides, "[a]pproved sources remain approved only if there are no major changes in the production methods or deposit characteristics." Based on these provisions, the plaintiffs claim a reasonable expectation that their quarries would remain prequalified so long as they complied with the adopted specifications. Finally, the plaintiffs argue they will show a course of dealing that created the same mutual understanding between the defendants and the industry, that KDOT publishes the specifications for this purpose, and that KDOT personnel relies on the specifications in determining which quarries are on the prequalified list.

The defendants clarify that the removal of the plaintiffs' quarries from the A-Listing/PQL only keep the defendants from supplying one class of quarry aggregate for concrete used by contractors in on-grade pavement

projects. The defendants have not denied the plaintiffs from doing business in Kansas or from using their quarry material for other uses in the construction of state highways. The defendants point out that there is no express or implied contract created by the quality specifications adopted by KDOT. The defendants have no objection to the Court taking judicial notice of KDOT's specifications or other public documents discussed in the parties' briefings.

At the outset, the defendants observe that the specifications define the contract as between the contractor and the Secretary of KDOT and specifically define suppliers as follows:

> An individual, partnership, corporation, other legal entity, or any combination thereof (joint venture) from which the Contractor obtains commodities needed to fulfill the contract. Suppliers are not a party to the contract between the Secretary and Contractor. However, the Contractor assumes liability for the suppliers as if the Contractor were providing the commodities with its own forces. Thus, when the specifications refer to the word "Contractor" but suppliers are providing the commodities the word "Contractor" includes the suppliers.

KDOT 2007 Standard Specifications for State Road and Bridge Construction, Definitions, § 101, p. 100-9.[4] Besides the lack of privity, the defendants argue that the Engineer retains the discretion to remove material from the prequalified list of quarries. In particular, the defendants look to subsection 1101.5 that states, even for aggregates from approved sources, "KDOT reserves the right to re-sample, test and reject any previously accepted

---

[4] http://www.ksdot.org/burconsmain/specprov/2007/101.pdf A copy appears as Appendix One.

aggregate if the Engineer **has reason to believe** it no longer complies with the Contract Documents." KDOT 2007 Standard Specifications for State Road and Bridge Construction, General Requirements for Aggregates, § 1101.5, p. 2 (bolding added).[5] Similar provisions are found in § 106 that govern the source of supply and give the Engineer or Inspector the authority to "reject materials at the project site even if the Engineer or Inspector previously approved the materials at the source of supply" and the authority to "reject the materials if, at any time, the Engineer determines the materials do not meet the Contract Documents." KDOT 2007 Standard Specifications, Control of Materials, § 106.1(b).[6] Finally, the defendants point to Part V of the Construction Manual, incorporated into a contract pursuant to Specifications at § 101.3.  This part of the Manual includes the following relevant provisions in Part V that govern the inspection, sampling, testing and acceptance of aggregates are the following:

> Class I and Class II Aggregates are composed of crushed limestone or dolomite. Additional testing is performed on concrete produced with Class I and Class II Aggregates to determine if acceptable levels of concrete freeze/thaw resistance are provided. The freeze/thaw testing is intended to reduce the risk of the occurrence of premature "D-Cracking". Class I and Class II Aggregates are intended for use in "on-grade" concrete slabs such as Portland cement concrete pavement. Prequalification to produce Class I and Class II Aggregate is granted to a quarry on a bed by bed basis for each distinct bed in the quarry face. "Official Quality" sampling and testing is also required. The acceptance of Class I and Class II aggregate is contingent upon

---

[5] http://www.ksdot.org/burconsmain/specprov/2007/1101.pdf   A copy appears as Appendix Two.
[6] http://www.ksdot.org/burconsmain/specprov/2007/106.pdf  A copy appears as Appendix Three.

production being from approved beds and in compliance with "Official Quality" requirements.

. . . .

(5) Continuation of Prequalified Status for Class I and Class II Aggregates

   After a quarry has been prequalified to produce Class I and Class II Aggregate from a specific bed(s) the prequalified status will continue as long as no major changes are made in the production process or occur in the deposit characteristics. Changes in deposit characteristics may be discovered either visually or through test results performed on Production Samples.

   . . . .

   When any party feels that any change in the prequalified status of a quarry is warranted they should notify the DME [District Materials Engineer] responsible for quarry inspection who in turn will advise the Chief of Materials and Research. The Chief of Materials and Research will review all available information on the changed conditions and render a decision on any such changes. Official notification of any change in Class I and Class II Aggregate Production status for a quarry will be provided by the DME to the quarry owner/operator and the appropriate contractors.

KDOT Construction Manual Part V-Materials § 5.02.05(c)(1) and (5) (2007).[7]

From these provisions, the defendants argue that KDOT reserves the right to reject materials even from prequalified sources based on the Engineer's judgment and that KDOT retains the discretion to change the prequalified status of a quarry based on its review and evaluation of available information. Because this discretion resides with KDOT, the defendants insist the plaintiffs cannot have a legitimate expectation to remain on the A-Listing/PQL indefinitely and to supply limestone as an aggregate for KDOT on-grade concrete projects.

---

[7]http://www.ksdot.org/burConsMain/Connections/ConstManual/pdfact5/02.pdf. A copy appears as Appendix Four.

After a close review of the cited state laws and KDOT's specifications and construction manual, the court concludes for all the reasons discussed below that, the plaintiffs are unable to allege a plausible claim of a protected property interest in remaining on the A-Listing/PQL or in supplying aggregate for concrete in KDOT's on-grade pavement projects. The plaintiffs place great weight upon the KDOT's development of detailed specifications for concrete aggregate used on KDOT's on-grade pavement projects. The plaintiffs rely on case law from other settings where the use of detailed and objective criteria indicated the government's discretion was so circumscribed as to give rise to certain expectations of entitlement. The court is not inclined to apply these propositions wholesale to the allegations in this case. To assume that the detailed, technical and objective nature of the specifications and testing criteria reflects an effort to limit KDOT's discretion in enforcing and applying these standards ignores the nature and function of KDOT's highly technical work and its compelling public safety responsibility. This assumption too would open up much of KDOT's express statutory responsibility of testing, researching and inspecting materials used for state highway projects to scrutiny on constitutional grounds. *See* K.S.A. 68-404(h). Owing to its breadth, this statutory mandate plainly and necessarily vests all such matters in the full discretion of KDOT to develop its own criteria, methods and procedures for this public safety purpose. The related regulations and specifications do not otherwise restrict or delimit the

manner, the scope or content of that discretion to such an extent as to give rise to an entitlement. This is not instance where the discretion is "constrained by particularized and comprehensive standards, criteria or conditions outlined by statute such that the public decisionmaker acts more like a conduit for distributing benefits to qualified bidders than an officer charged with making a determination that is judicial in its nature and character." *Interior Contractors, Inc. v. Board of Trustees of Newman Memorial County Hosp.*, 185 F. Supp. 2d 1216, 1228 (D. Kan. 2002) (quotation marks and citations omitted). The court takes this approach in part because these statutes are not the government's efforts to regulate or license an industry, trade or business but rather are the government's efforts to insure that only quality materials are used in state highway construction. *See Interior Contractors, Inc.*, 185 F. Supp. 2d at 1229 ("Because Kansas competitive bidding laws do not exist to benefit bidders, the lowest bidder is unable to assert any interest thereunder entitled to constitutional protection.") When placed against this backdrop of apparent governmental purposes and goals, the construction specifications and standards isolated and cited by the plaintiffs, as well as the purported practices involving them, are simply not enough to allege a plausible claim of a property interest.

The plaintiffs allege they have a property interest in remaining on the A-Listing/PQL and in supplying its aggregate based on having met the

published state specifications for that particular concrete aggregate. The plaintiffs argue that the specifications do not empower the defendants to remove a quarry from the A-Listing/PQL if the quarry meets the standard specifications so long as there are no major changes in production methods or deposit characteristics. In making this argument, the plaintiffs rely on § 1101 of the specifications that speak to the basis of approving, certifying and accepting aggregates.

This specification at § 1101 indicates that approval or prequalification remains only an initial determination and plainly distinguishes between approving a source and accepting aggregates. The specification then conditions acceptance of aggregates upon KDOT's express reservation of "the right to re-sample, test and reject any previously accepted aggregate if the Engineer has reason to believe it no longer complies with the Contract Documents." KDOT 2007 Standard Specifications § 1101.5(b).[8] Thus, the acceptance of aggregate on a project is left to the Engineer having no reason to believe that the aggregate fails to comply with all applicable requirements found within "Contract Documents," defined to include: "the proposal, exploratory work documents, addenda, amendments, contract form, contract bond, standard specifications, special provisions, project special provisions, general plans, detailed plans, the notice to proceed, material test methods, material test reports, materials

---

[8] *See supra* footnote 5.

certifications, Part V of the KDOT Construction Manual, change orders, . . . ."
KDOT 2007 Standard Specifications § 101.[9] Thus, that a source or supplier
has been approved is not a guarantee that its product will be accepted and
used on a project. *See Interior Contractors, Inc. v. Board of Trustees of
Newman Memorial County Hosp.*, 185 F. Supp. 2d 1216, 1226 (D. Kan.
2002) (no legitimate claim of entitlement to a public contract when public
body retains discretion to reject all bids); *Ruby-Collins, Inc. v. Cobb County*,
237 Ga. App. 517, 515 S.E.2d 187, 189 (1999) ("The existence of such a
discretion to reject bids is incompatible with an objectively reasonable
expectation of legitimate claim of entitlement by any *prospective* bidder. . . .
Consequently, we hold that RCI has no protected property interest in
remaining on a list of potential bidders pre-qualified to bid on future public
works contracts."), *reconsideration denied* (Apr. 7, 1999), and *cert. denied*
(Sept. 10, 1999).

Being on the prequalified list is not a protected interest, since it
does not assure the particular outcome, that is, KDOT's acceptance of the
aggregate. "[I]t is well established that an entitlement to nothing but
procedure [to be considered as a possible supplier on a KDOT project]
cannot be the basis for a property interest." *Teigen v. Renfrow*, 511 F.3d
1072, 1081 (10th Cir. 2007) (quotation marks and citation omitted) ("To be
considered for a promotion in accordance with the state system of merit is

---

[9] http://www.ksdot.org/burconsmain/specprov/2007/101.pdf   A copy
appears as Appendix Five.

no more than a claim of entitlement to a fair process," and this is not "a substantive right" creating a "property interest."). KDOT retains its own discretion to inspect, test and judge whether the aggregate complies with all contract documents, and KDOT is not bound under the different specifications to reach a particular outcome. *See Schanzenbach v. Town of La Barge*, 706 F.3d 1277, 1284-85 (10th Cir. 2013). KDOT is expressly vested with the discretion to reject the aggregate material if it has "reason to believe" the aggregate does not comply with any applicable contract document, including the standard specifications.

Nor do the plaintiffs cite any statutes, standards or regulations from which one plausibly can infer that the prequalified status is to serve as or equate to a license or certificate to do business. *Cf. Glover v. Mabrey*, 384 Fed. Appx. 763, 2010 WL 2563032 (10th Cir. 2010) (Oklahoma provided that prequalification to bid on ODOT contracts is not a license). Instead, the specifications reveal that they function like a contract term giving KDOT the final authority and discretion to oversee and insure that only quality materials are used on state projects. "Inspection, testing and approval of Contractor-furnished sources of supply are for KDOT's benefit, not to ensure Contractor quality control (QC) results. This inspection, testing, and approval is (sic) not a substitute for the Contractor's obligation to provide acceptable sources of supply." KDOT Standard Specifications § 106.1(a)(6).[10] In short,

---

[10] *See supra* footnote 6.

KDOT's approval of a source is nothing on which a Contractor can rely as absolving it of responsibility of providing quality product. This process of inspection, testing and approval is to benefit KDOT, not the contractor or its third-party suppliers.

The defendants offer other standard specifications that restate the discretion retained by KDOT's Engineer or Inspector to inspect materials at any time, even those from previously approved sources, and to reject them if the Engineer determines the materials are not meeting the contract documents. KDOT 2007 Standard Specifications § 106.1. "The Engineer, Inspector, or both may inspect, test, and approve or reject all materials before, during, and after incorporation into the work." KDOT 2007 Standard Specifications § 106.3.[11] Among the referenced contract documents is Part V of the Construction Manual which spells out that the prequalification of Class I and Class II aggregates (crushed limestone or dolomite) as being done "on a bed by bed basis for each distinct bed in the quarry face" and that "official quality sampling and testing is also required." KDOT Construction Manual, Part V, § 5.02.05(c)(1).[12] "[T]he Engineer of Tests will review sample records and perform Class I and Class II testing on at least three samples per quarry per year provided sufficient samples are submitted for testing."

---

[11]http://www.ksdot.org/burconsmain/specprov/2007/106.pdf A copy appears as Appendix Six.
[12] *See supra* footnote seven.

*Id.* at (c)(4)(c).[13] This same section also conditions prequalification for "as long as no major changes are made in the production process or occur in the deposit characteristics," but should "any party feel[] that any change in the prequalified status of a quarry is warranted" then it falls to the "Chief of Materials and Research . . . to review all available information on the changed conditions and render a decision on any such changes." *Id.* at § 5.02.05(c)(5).[14]

Besides annual testing, a quarry's prequalified status is subject to review whenever any party "feels" a change "is warranted," and the status is then subject to a KDOT official's discretionary review of all available information on the changed conditions. As the defendants argue, these provisions do not show that KDOT's discretion to remove a quarry's prequalified status is restricted to a specific and established finding that the quarry no longer meets a particular standard specification. This is even more so the case because the plaintiffs have not alleged that KDOT's discretion to change or add to the specifications or to the requirements found in contract documents is subject to any procedural limitations outside of a specific contractual relationship which has not been alleged here. The plaintiffs cannot plausibly allege a property interest from complying with some criteria or specifications when KDOT apparently has full discretion to change or add testing, inspection and quality criteria or provisions and to reject materials

---

[13] *Id.*
[14] *Id.*

and to remove the prequalified status based on the latest required criteria. In sum, the court is convinced that these provisions reveal the prequalified status to be too impermanent—reviewable at any time based on something as little as a "feeling" and subject to KDOT's significant discretion in establishing required material criteria--as to defeat any reasonable inference of a property interest existing in this status. *See John Gil Const., Inc. v. Riverso*, 72 F. Supp. 2d 242, 252-53 (S.D.N.Y. 1999), *judgment aff'd*, 7 Fed. Appx. 134 (2nd Cir. 2001). These provisions cannot be plausibly interpreted as meaningfully limiting KDOT's discretion as to allow removal only upon what could be likened to just cause.

This finding of no protected property interest need not be delayed, as plaintiffs argue, for discovery over industry understandings and course of dealing. It is one thing for an employer's custom and practice to emerge from guidelines or criteria limiting the employer's discretion and benefitting the employee and thereby offer an alleged basis for a protected property interest. *See Gunasekera v. Irwin*, 551 F.3d 461, 467 (6th Cir. 2009); *Bjorklund v. Miller*, 467 Fed. Appx. 758, 764-65 (10th Cir. 2012). It is quite another to allege a custom or practice rooted in standard specifications and related processes all of which exist to benefit the State and protect the public, not third-party suppliers, and all of which exist, operate, and are modifiable at the State's full discretion. The plaintiffs offer no allegations concerning KDOT's acceptance of the plaintiffs' aggregate that

resemble those in *Martin v. Stites*, 203 F. Supp. 2d 1237, 1249 (D. Kan. 2002), of a mutually explicit understanding that they "would receive all calls to which they were entitled under the geographic and rotational tow policies as adopted and administered." The plaintiffs have not alleged a claim based on mutual understandings arising apart from state policy or law. *See Veile v. Martinson*, 258 F.3d 1180, 1185-1186 (10th Cir. 2001) (a property interest claim based on county rotation policies "turn on whether the alleged claim of entitlement is supported or created by state law such as a state statute or regulatory scheme or decisional law." (internal quotation marks and citation omitted)). In sum, the record does not show the plaintiffs are capable of alleging a protected property interest that would arise from any mutual understandings about the A-Listing/PQL.

### Liberty Interest

The plaintiffs' proposed first amended complaint alleges a liberty interest in being on the "A-listing/PQL" and "reputational damage from the removal of the Ottawa quarry from the A-Listing/PQL based on the alleged failure to produce durable concrete using Martin Marietta's aggregate, which impacts Martin Marietta's ability to earn a living by selling construction aggregate," and "reputational damage from the removal of the Sunflower Quarry from the PQL based on its alleged failure of KDOT's unconstitutional testing regime, which impacts Martin Marietta's ability to earn a living by selling construction aggregate." (Dk. 31-1, ¶¶ 53, 54, 57, 58, 69, and 70).

The defendants argue for dismissal of these allegations because damage to reputation alone is not a protected liberty interest and there is no additional stigma or loss in status that has been alleged to support a stigma-plus claim for a business plaintiff. The plaintiffs say they have an actionable liberty interest claim by alleging that the defendants made false statements about the quality of the aggregate taken from the plaintiffs' quarries and that the plaintiffs have sustained a change in legal status by the removal of the quarries from the approved listings and the denial of property rights to remain on that approved listings.

First, as discussed above, the plaintiffs are unable to allege a protected property interest in having their quarries on A-listing/PQL. "Protected liberty interests may arise from two sources—the Due Process Clause itself and the laws of the States." *Kentucky Dept. of Corrections v. Thompson,* 490 U.S. 454, 460 (1989) (internal quotation marks and citation omitted). The court has already concluded from the different statutes, standard specifications, and construction manual provisions that KDOT retains vast discretion to inspect, test and judge whether aggregate complies with all contract documents, that KDOT is not bound by the different specifications to reach a particular outcome, and that KDOT has the express discretion to reject aggregate material whenever it has "reason to believe" the aggregate does not comply with any applicable contract document. Because the applicable Kansas law alleged here does not

mandate a particular outcome from a given set of predicates, the plaintiffs cannot allege a protected liberty interest arising from state law. *See Thompson*, 490 U.S. at 460-62; *Elliot v. Martinez*, 675 F.3d at 1241, 1246 (10th Cir. 2012); *Glover v. Mabrey*, 384 Fed. Appx. 763, 777 (10th Cir. 2010).

The plaintiffs do not dispute the defendants' characterization that their claimed liberty interest is subject to the stigma-plus standard. Instead, the plaintiffs stand on the allegation that the removal of the quarries from the A-Listing/PQL is enough to state a plausible claim on its face. "Damage to one's reputation alone, however, is not enough to implicate due process protections. *See Paul v. Davis*, 424 U.S. 693, 701 (1976) (stating that 'reputation alone, apart from some more tangible interests such as employment, is neither 'liberty' or 'property' by itself sufficient to invoke the procedural protection of the Due Process Clause')." *Gwinn v. Awmiller*, 354 F.3d 1211, 1216 (10th Cir.), *cert. denied*, 543 U.S. 860 (2004). The Tenth Circuit has laid out this stigma-plus standard in these terms:

> [A] plaintiff asserting that the government has violated the Due Process Clause by impugning his or her "good name, reputation, honor, or integrity," *Jensen* [*v. Redevelopment Agency of Sandy City*], 998 F.2d [1550] at 1558 [(10th Cir. 1993)], must demonstrate that: (1) the government made a statement about him or her that is sufficiently derogatory to injure his or her reputation, that is capable of being proved false, and that he or she asserts is false, and (2) the plaintiff experienced some governmentally imposed burden that "significantly altered [his or] her status as a matter of state law." *Paul*, 424 U.S. at 710-11, 96 S.Ct. 1155.

*Id.* at 1216. The plaintiffs' complaint and arguments offer no authority, factual or legal, for regarding the removal from the A-Listing/PQL to be a significant change in status under state law. Because the court already has held the removal from the A-Listing/PQL is not the denial of a federally protected property, the plaintiffs cannot rely on the "plus" being the denial of a property right. *See WMX Technologies, Inc. v. Miller*, 197 F.3d 367, 376 (9th Cir. 1999).

The plaintiffs' complaint alleges "reputational damage" due to the quarries' removal from the approved listings and the "impact" or lost opportunities for Martin Marietta to compete for contracts and profit from the sale of construction aggregate. (Dk. 31-1, ¶¶ 57 and 58). "[P]laintiffs must allege and present evidence of present harm to established business relationships," as "[d]amage to prospective employment opportunities is too intangible to constitute deprivation of a liberty interest." *Jensen v. Redevelopment Agency of Sandy City*, 998 F. 2d 1550, 1558-59 (10th Cir. 1993) (citations omitted); *See Williams v. Jaudegis*, 2012 WL 3839610 at *8 (D. Kan. 2012) ("allegations of speculative future harm are too intangible to constitute a deprivation of a liberty interest"). As a business, Martin Marietta certainly enjoys "the freedom to operate a legitimate business . . . [as] a protected liberty interest" but the lost ability to compete for contracts "does not typically qualify as the kind of 'tangible interest' that *Paul* contemplated." *Thinkstream, Inc. v. Adams*, 251 Fed. Appx. 282, 284, 2007 WL 3013210 at

*1 (5th Cir. 2007), *cert. dismissed*, 553 U.S. 1050 (2008). Nor has Martin

Marietta alleged that the loss of specific contracts "itself will entail a

significant impairment to operating a business." *Id.* (citing *San Jacinto Sav.*

*& Loan v. Kacal*, 928 F. 2d 697, 702 (5th Cir. 1991) ("holding that state

harassment of arcade patrons such that the arcade was forced out of

business was sufficient evidence of a § 1983 liberty interest"); *State of Tex.*

*v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995) ("holding that defamation of

a business by state officials that forced the business into bankruptcy would

qualify as a violation of a liberty interest")); *Bryn Mawr Care v. Sebelius*,

898 F. Supp. 2d 1009, 1014 (N.D. Ill. 2012) ("[F]or a plaintiff corporation to

satisfy the stigma-plus standard, the plaintiff must show that its alleged

reputational harm entirely destroyed its property right."); *Martin v. Stites*,

203 F. Supp. 2d at 1250-51 (economic hardship from the loss of government

business does not amount to the deprivation of a liberty interest if the

plaintiff still has private business available). Finally, this is not an instance

where the plaintiff has alleged a bidder's liberty interest affected by a denial

or debarment for lack of business integrity or honesty. *See  Gaylor, Inc. v.*

*Franklin County Board of Commissioners*, 2010 WL 909679, at *5 (S.D. Ohio

2010).

  The court concludes that the plaintiffs' proposed amended

complaint still does not allege a plausible liberty interest claim. The plaintiffs'

factual allegations do not plausibly support the destruction of a property

interest or a significant impairment to its operating business due to the quarries' removal from the A-Listing/PQL. For these reasons, on counts two and three, the court grants the defendants' motion for judgment on the pleadings and denies on futility grounds the plaintiffs' motion for leave to file a first amended complaint.

## COUNTS FOUR, FIVE AND SIX—STATE TORT CLAIMS

As they appear in the proposed amended complaint, these counts allege claims of intentional interference with business relationships, negligent interference with business relationships, and defamation, respectively.

<u>Discretionary Function</u>

There is no dispute that the defendants are "employees" of the state, that is, "persons acting on behalf of or in service of a governmental entity in any official capacity" for purposes of the Kansas Tort Claims Act ("KTCA"). K.S.A. 75-6102(c), (d). The KTCA makes governmental entities and their employees liable for a "negligent or wrongful act or omission." K.S.A. § 75–6103(a). "Under the KTCA, liability is the rule and immunity from liability is the exception." *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 233, 262 P.3d 336 (2011) (citations omitted). The defendants argue for the discretionary function exception under K.S.A. 75-6104(e), and they "bear the burden of demonstrating entitlement to immunity under an exception." *Id*. (citation omitted). "Only negligent or

42

wrongful acts or omissions of employees are excepted from liability by 75-6104, while acts or omissions involving more than the lack of ordinary care and diligence are not." *Moran v. State*, 267 Kan. 583, 596, 985 P.2d 127 (1999) (internal quotation marks and citation omitted). Thus, the defendants may "not be granted immunity under K.S.A. 1998 Supp. 76-6104(e) for defamatory statements," *id.*, or for intentional interference with business relations. The court will not discuss the applicability of this exception to count five, as Kansas law does not recognize this tort action on the facts alleged here.

<u>Count Five--Negligent Interference with Business Relationships</u>

The plaintiffs do not come forward with any Kansas case law, and the court has found none, that would recognize this to be a viable legal claim for relief in Kansas. The plaintiffs' memoranda lack any cogent reasons for not following the unpublished Kansas federal district court opinion that has summarily rejected and dismissed a similar claim as a matter of Kansas law. *Aces Transport, Inc. v. Ryan Transp. Services, Inc.*, 2006 WL 1487008 at *9 (D. Kan. 2006). The court notes the plaintiffs' willingness to dismiss this claim without prejudice should the court grant their motion for leave to amend. (Dk. 47, p.3 n.1). The court, however, grants the defendants' motion and dismisses this claim with prejudice because there is no Kansas case law to sustain such a legal theory on these facts. The court also denies the plaintiffs' leave to file an amended complaint with this claim.

<u>Count Six-Defamation</u>

The plaintiffs allege in their proposed first amended complaint the defendants have made defamatory representations that their quarries do not meet the specifications and "validly adopted, constitutional requirements" to be on the A-Listing/PQL. (Dk. 31-1). The defendants first argue that assuming the removal of the quarries is a representation then the plaintiffs are bringing a tort of product disparagement or injurious falsehood that is not recognized in Kansas. In response, the plaintiffs expand their claim arguing that the defendants' representations also implicate Martin Marietta's work and processes involved in extracting and preparing the aggregate for concrete use. The plaintiffs construe the defendants' representations to be an accusation "that Martin Marietta's mining plans, production plans, and quality-control mechanisms are unreliable." (Dk. 36, p. 29). The plaintiffs believe their claim is for the defamation of "the quality of Martin Marietta itself, as a company, and its quarries." *Id.* In reply, the defendants note that the proposed amended complaint does not allege any direct representations about Martin Marietta's abilities and that the claim alleges only the act of removing the quarries from the pre-qualified list. The defendants argue that Kansas law has not recognized a defamation claim for insinuations drawn from actions and that interpreting the removal of the quarries from this approved list as a statement that Martin Marietta is a bad quarry operator is an insufficient basis for stating a claim. Finally,

defendants say that Martin Marietta has admitted their Sunflower Quarry failed the 660 cycle testing (Dk. 31-1, ¶ 114) and was removed for that reason, so this truth prevents any defamation claim on these facts. The plaintiffs do not address these additional points in their reply. (Dk. 40).

"Kansas courts have not recognized the tort of product disparagement." *Hartford Fire Ins. Co. v. Vita Craft Corp.*, --- F. Supp. 2d ---, 2012 WL 6003027 at *10 n.12 (D. Kan. 2012) (citing *St. Catherine Hosp. v. Rodriguez*, 25 Kan. App. 2d 763, 768, 971 P.2d 754. 757 (1998)). This tort "is known variously as commercial disparagement, trade libel, slander of goods and disparagement of property." *Williams v. Evogen, Inc.*, 2013 WL 969808 at *7 n.3 (D. Kan. 2013). This tort turns on a critical statement being made about "the quality of the plaintiff's goods or services." *Hartford Fire Ins. Co.*, 2012 WL 6003027 at *10 n. 12.

Martin Marietta proposes alleging in count six no more than the defendants made critical representations about their goods (aggregate) or property (quarries) by removing the Ottawa and Sunflower Quarries from the A-Listing/PQL. There is no allegation the defendants represented that Martin Marietta lies about its products which was the business defamation claim recognized in *Sunlight Saunas, Inc. v. Sundance Sauna, Inc.*, 442 F. Supp. 2d 1160, 1167 (D. Kan. 2006). Nor are there allegations of representations relating to Martin Marietta's financial integrity, financial soundness, or ethical business practices. *See National Motor Club of*

45

*America, Inc. v. Auto Club of America Corp.*, 2003 WL 715902 at *4-*5 (D. Kan. 2003). As alleged, count six is a claim for product disparagement which is not a recognized tort under Kansas law.

The defendants argue that the defendants' removal of the quarries somehow implicates Martin Marietta's business plans and practices. The court fails to see how this implication, tenuously argued and never alleged, approaches what Kansas courts have recognized as actionable claims of business defamation. More importantly, the court fails to see how this claim is plausible given that the plaintiffs have alleged at paragraph 19 of their proposed first amended complaint that:

> KDOT, Miller, and Younger purportedly removed the Ottawa Quarry from the A-Listing because a KDOT employee allegedly observed D-Cracking in the pavement at multiple stretches of road containing limestone from a quarry that is now operated by Martin Marietta, but, at the time of construction of the pavement, was operated by another entity.

(Dk. 31-1, ¶ 19). Thus, the defendants' removal of Ottawa quarry from the A-Listing does not implicate Martin Marietta's business practices because it did not even own the quarry when the aggregate in question for D-Cracking was provided. As for the Sunflower Quarry, the plaintiffs alleged the defendants removed it from the PQL because it "allegedly failed the durability-factor standard at 660 cycles by a very narrow margin, while passing other criteria." (Dk. 31-1, ¶¶ 35-37). The defendants rightly challenge how the plaintiffs have alleged or can allege any false statement with respect to Sunflower Quarry's removal. For all these reasons, the court

grants the defendants' motion against this defamation claim and denies the plaintiffs' leave to file an amended complaint with this count.

## COUNT SEVEN:  42 U.S.C. § 1983--EQUAL PROTECTION

The defendants repeat only their Eleventh Amendment challenge to this count. The court's above rulings on the Eleventh Amendment issues applies to this count.

## COUNT EIGHT:  42 U.S.C. § 1983—SUBSTANTIVE DUE PROCESS

The court's above rulings on the plaintiffs' inability to allege a liberty or property interest in being on the A-listing/PQL and in supplying construction aggregate from its quarries precludes them from pursuing this count too. The court grants the defendants' motion on this count and denies the plaintiffs' leave to include this count in their amended complaint.

## COUNT NINE:  VOID FOR VAGUENESS, IN THE ALTERNATIVE TO COUNTS I THROUGH III, VII, AND VIII

The plaintiffs seek to add this count in their proposed amended complaint. The defendants offer no arguments for opposing its addition. Thus, the court will grant the plaintiffs' leave to add this count.

## COUNT TEN:  VIOLATION OF THE TAKINGS CLAUSE

Having already ruled that the plaintiffs have not alleged a protected property interest in being on the A-Listing/PQL, the court will dismiss this claim and deny leave to include this claim in the proposed amended complaint.

**COUNTS ELEVEN AND TWELVE: INJUNCTIVE AND DECLARATORY RELIEF**

Because these counts only allege particular kinds of relief and do not allege separate causes of action, their legal force depends on construing and linking them to the counts where such relief may be available. As pleaded and here construed, counts eleven and twelve seek injunctive and declaratory relief with respect to the remaining counts seven (equal protection) and nine (void for vagueness).

**ATTORNEYS' FEES**

The defendants note that the plaintiffs repeat in each count a request for "attorneys' fees." The plaintiffs explain that they are entitled to pursue fees under the plain language of 42 U.S.C. § 1988. The plaintiffs offer no authority for seeking fees in their remaining state tort claim, count four: "intentional interference with business relationships." The court grants the defendants' motion to strike this request for fees from count four of the proposed amended complaint.

IT IS THEREFORE ORDERED that with respect to the following counts: **One** (Violation of K.A.R. § 36-31-2), **Two** (Violation of 42 U.S.C. § 1983: Procedural Due Process—Pre-Deprivation Notice and Hearing), **Three** (Violation of 42 U.S.C. § 1983: Procedural Due Process—Post-Deprivation Notice and Hearing), **Five** (Negligent Interference with Business Relationships), **Six** (Defamation), **Eight** (Violation of 42 U.S.C. § 1983: Substantive Due Process) and **Nine** (**Ten** in Amended Complaint) (Violation

of the Takings Clause), the defendants' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (Dk. 22) is granted, and the plaintiffs' motion for leave to file first amended complaint pursuant to Fed. R. Civ. P. 15(a)(2) (Dk. 31) is denied;

IT IS FURTHER ORDERED that the plaintiffs' request for attorneys' fees is stricken from the remaining state law count **Four** (Intentional Interference with Business Relationships) and that counts **Ten** and **Eleven** (**Eleven** and **Twelve** in amended complaint) are construed as not alleging separate causes of action but only as seeking injunctive and declaratory relief for the remaining counts **Seven** (Violation of 42 U.S.C. § 1983: Equal Protection) and **Nine** (Amended Complaint Alternative Count of Void for Vagueness);

IT IS FURTHER ORDERED that KDOT is dismissed from all counts and leave to amend to include KDOT as a party defendant in any count is denied; and that with respect to any count claiming relief for a violation of state tort law or state constitutional law, the individual defendants in their official capacities are dismissed and leave to amend to include them in their official capacities is denied;

IT IS FURTHER ORDERED that the defendants' motion for judgment on the pleadings pursuant to Fed. R. Civ. P. 12(c) (Dk. 22) is denied, and the plaintiffs' motion for leave to file first amended complaint pursuant to Fed. R. Civ. P. 15(a)(2) (Dk. 31) is granted with respect to

counts **Four** (Intentional Interference with Business Relationships), **Seven** (Violation of 42 U.S.C. § 1983: Equal Protection), **Nine** (Amended Complaint Alternative Count of Void for Vagueness), and counts **Ten** and **Eleven** (**Eleven** and **Twelve** in amended complaint) seeking injunctive and declaratory relief respectively, as subject to all other rulings in this order.

Dated this 21st day of May, 2013, Topeka, Kansas.


s/ Sam A. Crow
Sam A. Crow, U.S. District Senior Judge